Slip Op. 26-61

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| GITI TIRE GLOBAL TRADING PTE. LTD., GITI RADIAL TIRE (ANHUI) COMPANY LTD., and GITI TIRE (FUJIAN) COMPANY LTD., | : | |
| Plaintiffs, | : | |
| v. | : | Before: Richard K. Eaton, Judge |
| UNITED STATES, | : | Court No. 24-00083 |
| Defendant, | : | |
| and | : | |
| UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, | : | |
| Defendant-Intervenor. | : | |

**OPINION**

[Plaintiffs' Motion for Judgment on the Agency Record is denied, and Commerce's Amended Final Results are sustained.]

Dated: June 12, 2026

*Matthew J. McConkey*, Mayer Brown LLP, of Washington, D.C., argued for Plaintiffs Giti Tire Global Trading Pte. Ltd., Giti Tire (Anhui) Company Ltd., and Giti Tire (Fujian) Company Ltd.

*Robert R. Kiepura*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington D.C., argued for Defendant the United States. On the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *L. Misha Preheim*, Assistant Director, and *Ashley Akers*, Senior Trial Counsel. Of Counsel at oral argument was *Charlie Chung*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

*Nicholas J. Birch*, Schagrin Associates, of Washington D.C., argued for Defendant-Intervenor United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC. With him on the brief were *Roger B. Schagrin* and *Elizabeth J. Drake*.

Eaton, Judge: This case involves a challenge to the U.S. Department of Commerce's ("Commerce" or "the Department") amended final results in the seventh administrative review of the antidumping order covering certain passenger vehicle and light truck tires from the People's Republic of China ("China"). *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Amended Final Results of Antidumping Duty Admin. Rev.; 2021-2022*, 89 Fed. Reg. 26,130 (Dep't of Commerce Apr. 15, 2024) ("Amended Final Results"); *see also Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Results of Antidumping Duty Admin. Rev. and Final Determination of No Shipments; 2021-2022*, 89 Fed. Reg. 17,817 (Dep't of Commerce Mar. 12, 2024) ("Final Results") and accompanying Issues and Decision Mem. (Mar. 5, 2024) ("Final IDM"), PR 424.

Before the court is the motion for judgment on the agency record of Giti Tire Global Trading Pte. Ltd. and two of its affiliates, Giti Radial Tire (Anhui) Company Ltd. and Giti Tire (Fujian) Company Ltd. (collectively, "Giti" or "Plaintiffs"). *See* Pls.' R. 56.2 Mot. J. Agency Record and Mem. Supp. ("Pls.' Mot."), ECF No. 23; Pls.' Reply Br. Supp. Mot. J. Agency Record ("Pls.' Reply"), ECF No. 28. "Plaintiffs are foreign manufacturers, producers, and exporters of" the subject tires. Compl. ¶ 5, ECF No. 8.

By their motion, Plaintiffs ask the court to issue an order (1) remanding Commerce's calculation of the surrogate value for ocean freight; and (2) directing Commerce "to confirm that it will issue final [liquidation] instructions [that are] the same as those issued in draft in this proceeding, and confirm that it will disregard" Commerce's assessment policy, as stated in *Non-Market Economy Antidumping Proceedings: Assessment of Antidumping Duties*, 76 Fed. Reg.

65,694 (Dep't of Commerce Oct. 24, 2011) ("Assessment Policy").[1] *See* Pls.' Reply at 2, 10. Pursuant to the Assessment Policy, unreported entries of merchandise are liquidated at the non-market economy country-wide rate. Assessment Policy, 76 Fed. Reg. at 65,694. Because Plaintiffs were not required to report all of their entries during the period of review, they argue that "[s]ubjecting such [unreported] entries to the China-wide rate is . . . inappropriate." Pl.'s Mot. at 9.

Defendant the United States ("Defendant" or "the Government") and Defendant-Intervenor United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("Defendant-Intervenor") oppose Plaintiffs' motion. Def.'s Resp. Pls.' Mot. J. Admin. Record ("Def.'s Resp."), ECF No. 24; Def.-Int.'s Resp. Mot. J. Admin. Record ("Def.-Int.'s Resp."), ECF No. 25. Defendant argues (1) that Commerce's calculation of the surrogate value for ocean freight is supported by substantial evidence and otherwise in accordance with law; and (2) Plaintiffs' claim regarding liquidation instructions is barred by the exhaustion doctrine. Def.'s Resp. at 10-12. Thus, Defendant asks the court to sustain the Amended Final Results. *Id.* at 16.

Jurisdiction is found under 28 U.S.C. § 1581(c).[2] For the following reasons, the court denies Plaintiffs' motion and sustains the Amended Final Results.

---

[1]     Pursuant to the Assessment Policy, unreported entries from non-market economy countries are liquidated at the non-market economy country-wide rate. Assessment Policy, 76 Fed. Reg. at 65,694. The draft liquidation instructions, in contrast, direct U.S. Customs and Border Protection to liquidate all of Plaintiffs' entries during the period of review, whether reported or not, at Giti's separate rate. Pls.' Reply at 8-9 (quoting Draft Liquidation Instructions (Sept. 25, 2023), PR 386). Plaintiffs want Giti's separate rate—and not China's country-wide rate—to apply to all of its entries during the period of review (including their unreported entries). Plaintiffs therefore ask the court to direct Commerce to disregard its Assessment Policy and instead rely on the language of the draft liquidation instructions when formulating the final liquidation instructions.

[2]     Plaintiffs pled two alternative bases for jurisdiction in the complaint. First, Plaintiffs asserted that the court has jurisdiction pursuant to 28 U.S.C. § 1581(c) because the action was commenced pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii). Compl. ¶ 2. "Alternatively,"

## BACKGROUND

Commerce initiated the seventh administrative review of the antidumping duty order, covering tires from China for certain passenger vehicles and light trucks, on October 11, 2022. *Initiation of Antidumping and Countervailing Duty Admin. Revs.*, 87 Fed. Reg. 61,278, 61,284 (Dep't of Commerce Oct. 11, 2022). The period of review covered August 1, 2021, through July 31, 2022. *Id.*

Commerce selected Plaintiffs—along with five additional Giti affiliates, i.e., Giti Tire (Anhui) Company, Ltd.; Giti Tire (Chongqing) Company, Ltd.; Giti Tire Greatwall Company, Ltd.; Giti Tire (Hualin) Company, Ltd.; and Giti Tire (Yinchuan) Company, Ltd.—as mandatory respondents and collapsed the Giti companies into a single entity.[3] Respondent Selection Mem. (Feb. 1, 2023) at 1 n.1, PR 117; Def.'s Resp. at 3 n.3.

---

Plaintiffs also stated in their complaint that the "court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1581(i) because this case arises from a determination made by the United States concerning 'tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue.'" *Id.* ¶ 3 (quoting 28 U.S.C. § 1581(i)(1)(B)). It is well settled that jurisdiction under subsection 1581(i) is only available when the case cannot be brought under a different jurisdictional basis. *See J.D. Irving, Ltd. v. United States*, 119 F.4th 48, 49-50 (Fed. Cir. 2024); *Rimco Inc. v. United States*, 98 F.4th 1046, 1052 (Fed. Cir. 2024). Because 28 U.S.C. § 1581(c) provides the court with exclusive jurisdiction to review the final results of an administrative review of an antidumping duty order, such as the Amended Final Results here, the court exercises jurisdiction under subsection 1581(c) and not subsection 1581(i).

[3]      In addition to Giti, Commerce selected another collapsed entity—comprised of Sumitomo (Hunan) Co., Ltd.; Sumitomo (Changshu) Co., Ltd.; and Sumitomo Rubber Industries, Ltd.—as a mandatory respondent. Respondent Selection Mem. (Feb. 1, 2023) at 1-2 n.2, PR 117. The Sumitomo companies are not, however, parties in this case.

## I.        Ocean Freight Surrogate Value Background

Here, when determining normal value,[4] Commerce calculated a surrogate value for the cost of ocean freight. Commerce "valued ocean freight using information published by Maersk Line." *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Preliminary Results of Antidumping Admin. Rev., Partial Recission, and Preliminary Determination of No Shipments; 2021-2022*, 88 Fed. Reg. 61,506 (Dep't of Commerce Sept. 7, 2023) ("Preliminary Results") and accompanying Issues and Decision Mem. (Aug. 30, 2023) ("Preliminary IDM") at 23, PR 370; Final IDM at 44 ("Thus, for the final results, we continue to use the Maersk data for the boat freight [surrogate value] on a USD per [kilogram] basis."). The Maersk data states the price of shipping on the basis of weight, i.e., U.S. dollars per kilogram, from Shanghai to various ports in the United States. As rebuttal information to the Maersk Line data, Giti placed information on the record showing the distances between cities referenced in the Maersk data. Giti Rebuttal Surrogate Value Comments (May 25, 2023) Ex. 4, PR 242. The rebuttal information included distances between seaports that were obtained from a website titled "sea-distances.org." *Id.*

On September 7, 2023, Commerce published its Preliminary Results. Based on the Maersk data, Commerce calculated a surrogate value rate for ocean freight that was stated on the basis of weight,[5] i.e., on a U.S. dollar per kilogram basis. Giti's Case Br. (Oct. 13, 2023) at 5, PR 394.

---

[4]        Normal value is either "(i) the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country" or, if applicable, "(ii) . . . the price at which the foreign like product is so sold . . . for consumption in a country other than the exporting country or the United States." 19 U.S.C. § 1677b(a)(1)(B)(i)-(ii).

[5]        While the rate is stated in terms of weight, the per kilogram rate, as discussed below, nevertheless incorporated distance since it was an average of rates for shipping from Shanghai to various distant ports. *See* Commerce's SV Master Sheet (Mar. 6, 2024) Ex. 10, PR 432.

Then, to calculate the surrogate value for ocean freight, Commerce multiplied the per kilogram surrogate value rate (based on the Maersk data) by the distance (based on Giti's submissions) that the tires were shipped.

Following the Preliminary Results, Giti filed an administrative case brief where it argued that "the surrogate value [for ocean freight] must be stated on a per[ kilogram], per[ kilometer] basis" and that Commerce was mistaken in the manner in which it performed this task. Giti's Case Br. at 5. Giti urged Commerce to *divide* the per kilogram surrogate value rate (based on the Maersk data) by the number of kilometers traveled by Maersk shipments to arrive at a per kilogram, per kilometer rate—that is, Giti asserted that Commerce should use the distance information that it placed on the record to divide into the Maersk data's per kilogram surrogate value rate, thus converting the rate from a per kilogram rate to a per kilogram, per kilometer rate. Then to arrive at a value for freight transportation, the per kilogram, per kilometer surrogate rate would be multiplied by the weight of the cargo *and* the kilometers traveled. *See* Giti's Case Br. at 5-6.

On March 12, 2024, Commerce published the Final Results of the administrative review. There, Commerce stated that it "disagree[d] with Giti regarding the [surrogate value] for [ocean] freight." Final IDM at 43. Thus, in the Final Results, Commerce did not change its formulation of the ocean freight surrogate value rate, or the calculation ocean freight surrogate value; Commerce continued to state the ocean freight surrogate value rate on a per kilogram basis while also including a distance factor in the calculation.[6]

---

[6]     By multiplying a per kilogram rate by the distances that Giti shipped its goods, Commerce incorrectly calculated the surrogate value. Commerce arrived at its value determination by multiplying the Maersk rate (which as noted already incorporated distance) by the kilometers traveled. Analysis of Ministerial Error Allegation (Mar. 29, 2024), at 4, PR 442. The mathematical error is that the rate itself was already the rate for shipping one kilogram from Shanghai to various cities. Commerce thus included distance twice.

Although Giti wanted Commerce to take distance into account when determining the ocean freight surrogate value, it disputed the manner in which Commerce had employed it. Once again, Giti took issue with Commerce multiplying the surrogate value rate by the distances that Giti shipped its merchandise when the surrogate value rate was stated on a per kilogram basis. Giti thought that to arrive at a per kilogram, per kilometer rate, the Maersk data should be divided by the distances traveled by Maersk shipments to arrive at a per kilogram, per kilometer rate.

As a result, following the publication of the Final Results, Giti filed a ministerial error allegation. Giti's Ministerial Error Allegation (Mar. 12, 2024), PR 437. Giti once again pointed out that Commerce had multiplied the ocean freight surrogate value rate by the distances that Giti shipped its goods. *Id.* at 2-3. For Giti, then, it was mathematically incorrect to multiply the surrogate value rate by the weight of the merchandise *and* distances shipped when the rate itself was based only on the weight of the cargo for shipment from Shanghai to various U.S. cities. *See id.*

According to Giti, the problem was that Commerce had "applied a surrogate value stated in the wrong unit of measure." *Id.* at 2. In other words, Giti insisted that to arrive at the correct surrogate value calculation, Commerce needed to divide the Maersk surrogate value rate by distance so that a distance factor could properly be included in the calculation. *See id.* at 4.

Upon review of Giti's allegation, Commerce agreed that it had made a ministerial error. Commerce stated that the manner in which it had included the distance factor in the surrogate value calculation was "mathematically incorrect, given that the [ocean] freight [surrogate value] is stated on a U.S. dollars per kilogram basis," i.e., on the basis of weight. Analysis of Ministerial Error Allegation (Mar. 29, 2024) at 3-4, PR 442. But Commerce disagreed with Giti over how to resolve the ministerial error.

Rather than restating surrogate value on the basis of both weight *and* distance (i.e., a per kilogram, per kilometer basis) as Giti had proposed, Commerce determined to state the surrogate value solely on the basis of weight (i.e., on a per kilogram basis)[7] and thus did not employ the distances between ports that Giti had placed on the record. Therefore, Commerce "revised [its] calculations to *remove* the distance component from the calculation of [ocean] freight," and determined to state the surrogate value for ocean freight only on the basis of weight (i.e., a per kilogram basis). *Id.* at 4 (emphasis added). Following Commerce's publication of the Amended Final Results, Plaintiffs commenced this lawsuit, in part, to challenge Commerce's calculation of the ocean freight surrogate value rate, and the ocean freight surrogate value, on a per kilogram basis.

The second issue before the court has to do with Commerce's anticipated final liquidation instructions to U.S. Customs and Border Protection ("Customs"). Compl. ¶¶ 24, 26; Pls.' Mot. at 2-3.

## II.     Liquidation Instructions Background

As part of Giti's participation in the administrative review, it responded to Commerce's Section C questionnaire, which directed Plaintiffs to "[r]eport each U.S. sale of merchandise entered for consumption during the [period of review], except . . . for [constructed export price[8]]

---

[7]        While Commerce stated that it used the Maersk data based on weight, it is worth noting again that the Maersk rate incorporates distance because it is an average of Maersk's per kilogram rates for shipping goods from Shanghai to various U.S. cities. Commerce's SV Master Sheet Ex. 10.

[8]        Constructed export price is "the price at which the subject merchandise is first sold . . . in the United States . . . by or for the account of the producer of exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter." 19 U.S.C. § 1677a(b). Constructed export price is used in an

sales made after importation, report each transaction *that has a date of sale within the [period of review]*." Resp. from Mayer Brown LLP to Sec'y of Commerce Pertaining to Giti Sec. C Quest. Resp. (Mar. 27, 2023) ("Giti's Sec. C Resp.") at 1, PR 173 (emphasis added).

Giti has a U.S. affiliate, Giti Tire (USA) Ltd. ("Giti USA"), which imports and "sells tires to its customers in the United States." Giti's Sec. C Resp. at 20. All of Giti's sales during the period of review were to Giti USA. Giti USA resold some, but not all, of the subject tires to unaffiliated purchasers in the United States during the period of review.

Giti reported in Section C, as constructed export price sales, Giti USA's resales of the subject tires to unaffiliated purchasers during the period of review:

> Because Giti properly followed the Department's questionnaire instructions and practice, it reported its U.S. [constructed export price] sales with a date of sale within the [period of review]. As such, there were, of course, import entries of Giti subject merchandise during the period of review that were not reported in the U.S. sales data, or that were only reported partially.

Pls.' Mot. at 3; *see also* Pls.' Reply at 9 (stating, by way of example, "in the last four weeks of the [period of review], Giti imported the subject merchandise, but some of that merchandise was not yet sold to an unaffiliated party during the [period of review]. As such, those entries [d]id not appear in Giti's U.S. Sales database."). Thus, Giti did not report some of its entries during the period of review because, while they were entered during the period of review, they were not sold to an unaffiliated purchaser during that time frame.

On September 7, 2023, Commerce preliminarily determined that Giti dumped subject tires during the period of review. *See* Preliminary Results, 88 Fed. Reg. at 61,506. As to the unreported entries, in the Preliminary Results Commerce stated that "[p]ursuant to Commerce's *assessment*

---

antidumping investigation, instead of export price, when the first sale of the subject merchandise by the exporter or producer is to an affiliated purchaser. *See id.* § 1677a(a)-(b).

*practice*, for entries that were not reported in the U.S. data submitted by Giti . . . we will instruct [Customs] to liquidate such entries at the China-wide rate."[9] *Id.* at 61,508 (citing Assessment Policy, 76 Fed. Reg. at 65,694) (emphasis added).

The Assessment Policy provides:

> For entries that are not reported in the reviewed company's U.S. sales databases submitted to the Department during an administrative review, or otherwise determined not covered by the review (*i.e.,* the reviewed exporter claims no shipments), the Department will instruct [Customs] to liquidate such entries at the NME-wide rate as opposed to the company-specific rate declared by the importer at the time of entry.

Assessment Policy, 76 Fed. Reg. at 65,694.

After the Preliminary Results were published, Commerce placed draft liquidation instructions on the record:

> 1a. For all shipments of passenger tires from the People's Republic of China (China) produced and exported by Giti Tire Global Trading Pte. Ltd.; Giti Radial Tire (Anhui) Company Ltd.; Giti Tire (Fujian) Company Ltd.; Giti Tire (Anhui) Company Ltd.; Giti Tire (Chongqing) Company Ltd.; Giti Tire (Hualin) Company Ltd.; Giti Tire (USA) Ltd.; Giti Tire (Yinchuan) Company, Ltd.; Giti Tire Greatwall Company, Ltd. (A-570-016-134), imported by or sold to . . . [Giti USA], and entered, or withdrawn from warehouse, for consumption during the period 08/01/2021 through 07/31/2022 assess an antidumping liability equal to [Giti's separate rate] . . . .

> 1b. For all shipments of passenger tires from China exported by Giti Tire Global Trading Pte. Ltd.; Giti Radial Tire (Anhui) Company Ltd.; Giti Tire (Fujian) Company Ltd.; Giti Tire (Anhui) Company Ltd.; Giti Tire (Chongqing) Company Ltd.; Giti Tire (Hualin) Company Ltd.; Giti Tire (USA) Ltd.; Giti Tire (Yinchuan) Company, Ltd.; Giti Tire Greatwall Company, Ltd., entered, or withdrawn from warehouse, for consumption during the period 08/01/2021 through 07/31/2022, and not covered by paragraph 1a, assess antidumping duties at the China-wide rate. The China-wide rate is 76.46 percent.

---

[9]      The 76.46% China-wide rate was established in the 2015 antidumping duty order. *See Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Amended Final Affirmative Antidumping Duty Determination and Antidumping Duty Order; and Amended Final Affirmative Countervailing Duty Determination and Countervailing Duty Order*, 80 Fed. Reg. 47,902, 47,904 n.19 (Dep't of Commerce Aug. 10, 2015).

Draft Liquidation Instructions (Sept. 25, 2023), PR 386.

In other words, under paragraph 1a of the draft instructions, Commerce would instruct Customs to liquidate all entries sold to Giti USA at Giti's separate rate—that is, whether they had been resold to an unaffiliated purchaser or not. The draft instructions did not distinguish between entries that were reported in Section C of the questionnaire, and those that were not. Paragraph 1b, a catch all provision, states that entries that were not covered by paragraph 1a, would be liquidated at the China-wide rate. But all of Giti's entries during the period of review were covered by paragraph 1a because all of Giti's entries were sold to Giti USA. *See* Pl.'s Reply at 9.

Thus, it would appear that the Assessment Policy cited in the Preliminary Results and the draft instructions were at odds with one another, in that the Assessment Policy stated that Customs would liquidate unreported entries (i.e., entries with a date of sale outside the period of review) at the China-wide rate, and the draft instructions said that those same entries would be liquidated at the Giti-specific rate.

In their administrative case brief filed with Commerce, submitted "to address issues raised in" Commerce's Preliminary Results, Plaintiffs did not comment on Commerce's statement that it would instruct Customs to liquidate unreported entries at the China-wide rate, pursuant to the Assessment Policy. Giti's Case Br. at 1. Nor did Plaintiffs comment on Commerce's draft liquidation instructions. And Plaintiffs did not raise any concern about the difference between the Assessment Policy and the draft liquidation instructions—i.e., that Giti's unreported entries would be liquidated at the China-wide rate under the Assessment Policy, and at Giti's separate rate under the draft instructions.

In both the Final Results and the Amended Final Results, Commerce, as it had in the Preliminary Results, stated: "Pursuant to Commerce's assessment practice, for entries that were

not reported in the U.S. data . . . we will instruct . . . [Customs] to liquidate such entries at the China-wide rate." Final Results, 89 Fed. Reg. at 17,819; Amended Final Results, 89 Fed. Reg. at 26,131.

## LEGAL FRAMEWORK

In an antidumping duty case, Commerce must determine whether goods are being sold, or are likely to be sold, in the United States at less than fair value. *See* 19 U.S.C. § 1673. Commerce generally makes this determination by comparing export price and normal value, as adjusted. *See id.* §§ 1677a, 1677b.

Export price, or U.S. price, is

> the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States.

*Id.* § 1677a(a).

Normal value is either "(i) the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country" or, if applicable, "(ii) . . . the price at which the foreign like product is so sold (or offered for sale) for consumption in a country other than the exporting country or the United States." *Id.* § 1677b(a)(1)(B)(i)-(ii).

Where the exporting country is a non-market economy, such as China, the statute authorizes Commerce to determine normal value using surrogate values for the factors of production used to make the subject merchandise plus all general expenses and profit. *See id.* § 1677b(c)(1); *Fujian Yinfeng Imp. & Exp. Trading Co. v. United States*, 46 CIT __, __, 607 F. Supp. 3d 1301, 1307 (2022). Factors of production include, but are not limited to, the "hours of labor required," the "quantities of raw materials employed," and "amounts of energy and other

utilities consumed." 19 U.S.C. § 1677b(c)(3)(A)-(C); *see also* 19 C.F.R. § 351.408(c). Commerce makes an affirmative dumping determination when the subject merchandise's normal value exceeds its export price.[10] *See Fujian*, 46 CIT at __, 607 F. Supp. 3d at 1306-07. Antidumping duties on subject merchandise thus "reflect the difference between the foreign exporter's sales price and the domestic price of the merchandise." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1000 (Fed. Cir. 2003).[11] The antidumping duty rate is the dumping margin expressed as "the amount by which the normal value of the merchandise exceeds the export price (or the constructed export price) of the merchandise." 19 U.S.C. § 1673e(a)(1).

"After Commerce makes final [antidumping] . . . determinations, it publishes the rates in a final order." *Rimco Inc. v. United States*, 94 F.4th 1046, 1050 (Fed. Cir. 2024). Subsequently, "Commerce issues liquidation instructions, directing [Customs] to assess entries subject to the [antidumping] orders at the final published respective rates." *Id.* "Once Customs receives liquidation instructions from Commerce—and unless liquidation is enjoined—Customs will actually liquidate the entries made during the review period covered by Commerce's determination, 'collect[ing] any increased duties due or refund[ing] any excess of the estimated duties deposited on entry.'" *Shinyei Corp. of Am. v. United States*, 524 F.3d 1274, 1277 (Fed. Cir. 2008) (quoting *Wolff Shoe Co. v. United States*, 141 F.3d 1116, 1118 (Fed. Cir. 1998)).

---

[10]     "Dumping margin" is defined as "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A).

[11]     It is worth noting that the International Trade Commission also made an injury determination. *Certain Passenger Vehicle and Light Truck Tires from China*, Inv. Nos. 701-TA-522 and 731-TA-1258, USITC Pub. 4545 (Aug. 2015); *see also Passenger Vehicle and Light Truck Tires from China*, Inv. Nos. 701-TA-522 and 731-TA-1258, USITC Pub. 5158 (Feb. 2021) (determining "that revocation of the antidumping and countervailing duty orders on passenger vehicle and light truck tires from China would be likely to lead to continuation or recurrence of material injury to an industry in the United States").

**STANDARD OF REVIEW**

Commerce's Amended Final Results will be sustained unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

**DISCUSSION**

Plaintiffs' claims involve two issues. The first is whether Commerce's calculation of the surrogate value for ocean freight is supported by substantial evidence and otherwise in accordance with law. The second issue is whether the court should order Commerce to disregard its Assessment Policy referenced in the Preliminary, Final, and Amended Final Results, and instead rely solely on the draft liquidation instructions when creating the final liquidation instructions that will be sent to Customs.

**I.      Ocean Freight Surrogate Value**

Giti claims that Commerce "did not appropriately correct [its ministerial error] in the Amended Final Results" when it removed the distance factor from the ocean freight surrogate value calculation and determined to state ocean freight on a per kilogram basis alone. Compl. ¶ 26. Giti argues that, because Plaintiffs had "submitted the distance information for each boat freight route in its rebuttal surrogate value submission," Commerce "had all of the information necessary to calculate the surrogate value for [ocean] freight" on a per kilogram, per kilometer basis. Pls.' Mot. at 7. Giti maintains that it is Commerce's normal practice to state ocean freight on a per kilogram, per kilometer basis and that the Department was thus required to provide an explanation for its departure from its normal practice. *Id.* at 8. Put another way, Giti says that

Commerce was wrong to calculate the ocean freight surrogate value based solely on the cargo's weight when, according to Giti, Commerce normally calculates the ocean freight surrogate value based on the cargo's weight *and* the distance that the cargo traveled. Giti insists that Commerce should have divided the Maersk shipping rates by the number of kilometers the tires were shipped to come up with a per kilogram, per kilometer rate. *Id.* at 2-3.

In response, Defendant claims "Plaintiffs are . . . wrong that Commerce's practice is to calculate all [ocean] freight on a per-kilogram, per-kilometer basis without regard for the underlying surrogate value source or record." Def.'s Resp. at 11. Rather, Defendant argues, "Commerce has previously calculated [ocean] freight on a per-kilogram basis, as opposed to a per-kilogram, per-kilometer basis." *Id.* Defendant further contends that, because the Maersk data states ocean freight on a per kilogram basis (and not a per kilogram, per kilometer basis), "Commerce declined to make the distance adjustment advocated by [P]laintiffs because it could be 'distortive.'" *Id.* at 10. "Indeed, as noted in the Final Results, Commerce followed its exact methodology in this case in the preceding administrative review of this order." *Id.* at 11. Put another way, Defendant (1) challenges Giti's description of Commerce's normal practice, and (2) argues that Commerce's decision to calculate ocean freight without a distance factor was justified because the underlying data did not use a distance factor.

Defendant-Intervenor's arguments mirror those of Defendant. Additionally, Defendant-Intervenor argues that Commerce was prohibited by its regulations from incorporating Plaintiffs' distance data into its surrogate value calculation. Def.-Int.'s Resp. at 11. Because Giti's distance information was submitted as a rebuttal—and not as a surrogate value submission— Defendant-Intervenor argues that Commerce's regulations disallow using the distance information to calculate factors of production. *Id.* (citing 19 C.F.R. § 351.301(c)(3)(iv), which provides that

"[i]nformation submitted to rebut, clarify, or correct factual information . . . will not be used to value factors under § 351.408(c)").

The court holds that Commerce's surrogate value calculation for ocean freight is supported by substantial evidence and otherwise in accordance with law.

First, Giti's proposed calculation of the ocean freight surrogate value would distort the Maersk data. This is because it appears that distance is already baked into the Maersk data albeit on an apparently inconsistent basis. As a result, dividing the Maersk shipping rates (which already have a distance component) by a distance factor, as Giti proposes, would have the effect of having both a weight factor *and* a distance factor divided by a distance factor. In other words, adding another distance component would necessarily distort the company's shipping charges because the charges themselves are set with distance as a factor in the determination.

The shipping rates in the Maersk data vary between destination cities, with shipping from Shanghai to the West Coast of the United States costing less than shipping to the East Coast. Commerce's SV Master Sheet (Mar. 6, 2024) Ex. 10, PR 432 (listing the average East Coast shipping rate as 0.2901 USD per kilogram and the average West Coast shipping rate as 0.2389 USD per kilogram). But a longer shipping distance does not always correlate directly with an increased rate in the Maersk data: shipping rates from Shanghai to some U.S. cities, despite varying distances, received the same per kilogram rate and other cities with longer distances received a lower per kilogram rate. *Id.* For example, according to Maersk's data, in August 2021, the per kilogram rate for shipping a 20-foot container from Shanghai to Baltimore, MD was the same as shipping the same 20-foot container to Savannah, GA. *Id.* (listing the rate shipping 20-foot containers to both cities as 0.2312 USD/kg). According to Giti's distance data, however, the distance from Shanghai to Savannah is 18,840.3960 kilometers, while the distance to Baltimore is

19,471.9280 kilometers. Giti Rebuttal Surrogate Value Comments Ex. 4. Similarly, in February 2022, the rate for shipping from Shanghai to Houston, TX (0.3021 USD/kg) was greater than the rate to ship to Baltimore, MD (0.2536 USD/kg) even though the distance to Houston from Shanghai (18,775.5760 kilometers) is smaller than the distance to Baltimore (19,471.9280 kilometers). *Id.*; Commerce's SV Master Sheet Ex. 10.

Thus, although Maersk's rates generally reflect a higher cost for shipping a longer distance, because of the indefinite role that distance plays in the Maersk data, it would be distortive of the data to simply divide the per kilogram rates by the distances shipped. Or, as Commerce stated, "there is nothing on the record . . . to show why revising this calculation would not be distortive." Final IDM at 43.

Furthermore, the court is not convinced that it is Commerce's normal practice to state ocean freight on a per kilogram, per kilometer basis, *regardless of the underlying data*. Plaintiffs point to prior Commerce cases where ocean freight and inland boat freight were calculated on a per kilogram, per kilometer basis. Pls.' Reply at 6. But there are also Commerce cases where ocean freight was stated on a per kilogram basis. In fact, Plaintiffs even cite to one such case. *See* Pls.' Reply at 5 (citing *1, 1, 1, 2 Tetrafluoroethane (R-134a) From the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Affirmative Determination of Critical Circumstances, in Part*, 82 Fed. Reg. 12,192 (Dep't of Commerce Mar. 1, 2017) ("Tetra Final Results") and accompanying Issues and Decisions Mem. ("Tetra Final IDM")).[12]

---

[12]    The issue in *Tetra* was whether Commerce would calculate the inland boat freight surrogate value using ocean freight data or using truck freight data. Tetra Final IDM at 21-24. "[T]he distances relevant to the ocean freight rates [were] not on the record," and therefore Commerce determined that "ocean freight rates [could] not be used to calculate a per kilogram, per kilometer inland boat freight surrogate value." *Id.* at 23. "However, using the truck freight surrogate value, [Commerce was] able to calculate a per kilogram per kilometer surrogate value, as is our normal practice." *Id.* As a result, Commerce decided to rely on the truck freight data.

When the underlying data is stated on a per kilogram basis, Commerce has stated its surrogate value rate in the same way. *See, e.g.*, *id.*; *Nantong Uniphos Chems. Co. v. United States*, 43 CIT __, __, 415 F. Supp. 3d 1345, 1364 (2019) (revising "the surrogate value for ocean freight from 0.1833 USD/kg to 0.1962 USD/kg"); *Chlorinated Isocyanurates From the People's Republic of China: Preliminary Results of Antidumping Duty Admin. Rev.; 2013-2014*, 80 Fed. Reg. 39,060 (Dep't of Commerce July 8, 2015) and accompanying Issues and Decisions Mem. at 19 (calculating an ocean freight surrogate value rate of 0.27 USD per kilogram).[13] Thus, Plaintiffs are incorrect to claim that Commerce's "practice is to state the surrogate value for [ocean] freight on inputs on a per-kilogram, per-kilometer basis" regardless of the underlying data. Pls.' Reply at 7.

Because of the indefinite role of distance in the Maersk data, Commerce relied on substantial evidence in rejecting Giti's proposed surrogate value calculation. Moreover, it is not Commerce's normal practice to calculate ocean freight on a per kilogram, per kilometer basis, and Commerce was thus free to calculate a per kilogram rate based on the underlying data.

---

On its face, *Tetra* seems to support Plaintiffs' position, but it does not. Upon further scrutiny, it is evident that *Tetra* demonstrates Commerce's reluctance to adjust surrogate value data stated on a per kilogram basis into a surrogate value rate stated on a per kilogram, per-kilometer basis. First, regardless of how Commerce decided to calculate inland boat freight in *Tetra*, the ocean freight surrogate value rate was stated on a *per kilogram basis*. Tetra Final IDM at 22. Second, in *Tetra* Commerce specifically declined to use ocean freight data stated on a per kilogram basis to calculate a surrogate value rate stated on a per kilogram, per kilometer basis. *Id.* at 23. Thus, both for ocean freight and inland boat freight, Commerce opted not to adjust per kilogram based surrogate value data to a surrogate value rate stated on a per kilogram, per kilometer basis.

[13] Commerce continued to state the ocean freight surrogate value rate on the basis of weight (and not on the basis of weight and distance) in the final results of this investigation. *Chlorinated Isocyanurates From the People's Republic of China: Final Results of Antidumping Duty Admin. Rev.; 2013-2014*, 80 Fed. Reg. 1,167 (Dep't of Commerce Jan. 11, 2016) and accompanying Issues and Decisions Mem. at 14.

## II.        Liquidation Instructions

Next the court turns to the dispute over Commerce's eventual final liquidation instructions. Giti asks the court to direct Commerce "to confirm that it will issue final [Customs] instructions the same as those issued in draft in this proceeding and confirm that it will disregard the referenced language in [Amended Final Results]," i.e., the Assessment Policy.[14] Pls.' Reply at 10. According to Plaintiffs, neither the factual record nor the law supports the application of the China-wide rate to Giti's non-reviewed imports pursuant to the Assessment Policy. Pls.' Mot. at 9. As a result, Giti asks the court to order that Commerce rely on the draft liquidation instructions which provide for the liquidation of Giti's entries at Giti's separate rate—and not the Assessment Policy referenced in the Preliminary, Final, and Amended Final Results—when crafting the final liquidation instructions. Pls.' Reply at 10.

Defendant and Defendant-Intervenor maintain that Giti has waived any challenge to the Assessment Policy because it failed to exhaust its administrative remedies, and no exception to the exhaustion doctrine applies. Def.'s Resp. at 13 ("Commerce placed draft [Customs] instructions on the record along with its Preliminary Results that showed exactly how Commerce intended to

---

[14]        To reiterate, the Assessment Policy was published by Commerce on October 24, 2011, and it states that, in the non-market economy context, Commerce will direct the liquidation of unreported entries at the country-wide rate. More specifically, the policy states that

> [f]or entries that are not reported in the reviewed company's U.S. sales databases submitted to the Department during an administrative review, or otherwise determined not covered by the review (*i.e.,* the reviewed exporter claims no shipments), the Department will instruct [Customs] to liquidate such entries at the NME-wide rate as opposed to the company-specific rate declared by the importer at the time of entry.

Assessment Policy, 76 Fed. Reg. at 65,694.

instruct [Customs] to liquidate unreported entries at the China-wide rate. . . . But plaintiffs never challenged the instructions at either stage."); Def.-Int.'s Resp. at 13-15.

By statute, this Court is directed to, "where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). "[T]his statutory mandate 'indicates a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies.'" *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (quoting *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007)). There are, nevertheless, instances where this Court will not require exhaustion:

> where exhaustion would be futile, or inequitable and an insistence of a useless formality; where a court decision issued after the administrative determination might have materially affected the agency's actions; where entertaining the issue would not intrude upon the agency's prerogatives because it is a pure question of law not requiring further factual development; and where the plaintiff had no reason to suspect that the agency would refuse to adhere to clearly applicable precedent.

*Jiaxing Brother Fastener Co. v. United States*, 34 CIT 1455, 1466, 751 F. Supp. 2d 1345, 1356 (2010) (citing *Consol. Bearings Co. v. United States*, 25 CIT 546, 552-53, 166 F. Supp. 2d 580, 586 (2001)).

Plaintiffs acknowledge that they did not challenge Commerce's reliance on the Assessment Policy at the administrative level. Tr. of Oral Arg. at 35:9-13, ECF No. 41 ("[T]he Government is correct . . . when they talk about exhaustion of remedies. That same language was in the preliminary decision, and we did not address it . . . in a case brief."). Indeed, their failure to object was apparently intentional and based on Plaintiffs' "belief . . . that they [i.e. Commerce employees] don't actually follow" the Assessment Policy. *See id.* at 35:6.

Additionally, Plaintiffs "did not comment on the draft . . . [liquidation] instructions . . . [because] those instructions were correct, and provided no reason for concern to

Giti." Pls.' Reply at 8. For Giti, then, there was no reason to raise this issue at the administrative level because Giti saw no issue with the draft liquidation instructions that Commerce placed on the record. *See id.* at 9.

Plaintiffs' problem is that they have now apparently become alive to the idea that the language in the Amended Final Results may result in final liquidation instructions that are different from the draft liquidation instructions. Specifically, the Assessment Policy would provide for liquidation of Plaintiffs' entries at the China-wide rate,[15] which is a higher rate than the Giti-specific rate that would apply under the draft liquidation instructions.

As to the exhaustion of remedies, while requiring Plaintiffs to exhaust their administrative remedies might fulfill the requirements of the law, the court is not convinced it would be equitable. *See Thomson Consumer Elecs., Inc. v. United States*, 247 F.3d 1210, 1215 (Fed. Cir. 2001) ("Exhaustion of administrative remedies . . . is unnecessary in those circumstances where equity so requires."); *Am. Ass'n of Exps. & Imps.–Textile & Apparel Grp. v. United States*, 7 CIT 79, 85, 583 F. Supp. 591, 597 (1984) ("[E]xhaustion is not a strict formalistic requirement . . . but, rather, a discretionary tool to be used by the court and informed by prudential considerations which include . . . the equities of a given situation."). After all, the draft liquidation instructions with which Plaintiffs were satisfied were issued subsequent to the Preliminary Results. Thus, despite its references to the Assessment Policy, Commerce's apparent intention is to issue liquidation instructions that liquidate Plaintiffs' entries at the Giti-specific rate. It was therefore completely

---

[15]　　While this may be the case, the Assessment Policy prohibits liquidation at "the company-specific rate declared by the importer at the time of entry." Assessment Policy, 76 Fed. Reg. at 65,694. Here, the company-specific rate was not "declared by the importer at the time of entry," but determined in the administrative process now before this court. It is thus not clear that the Assessment Policy is relevant to the facts of this case.

understandable that Plaintiffs' counsel would not put its client to the cost of instituting, what appeared to be, a possibly unnecessary claim.

Nevertheless, a challenge to liquidation instructions is normally made to Commerce's *final* instructions. *See, e.g.*, *Ugine & ALZ Belgium v. United States*, 551 F.3d 1339, 1345 (Fed. Cir. 2009) (concerning "final antidumping liquidation instructions" that Commerce had actually issued); *Consol. Bearings Co.*, 348 F.3d at 1001-1002 (discussing the legality of liquidation instructions that Customs had already received from Commerce); *Shinyei*, 524 F.3d at 1278 ("Also in 1998, Commerce issued instructions to Customs to liquidate entries made during the 1990-1991 review period at the final antidumping rates set by the Amended Review Results . . . ."). Because Commerce has not issued final liquidation instructions in this case, Plaintiffs' claim is speculative and therefore premature and will not be considered by the court. *See, e.g.*, *Hall v. Beals*, 396 U.S. 45, 49 (1969) (stating that "speculative contingencies afford no basis for our passing on the substantive issues"). Plaintiffs may, however, seek to contest the final liquidation instructions once they are issued. And it may well be that, if those instructions rely on the Assessment Policy (which is not founded in a regulation), they could be found to be unlawfully applied where the separate rate is known.

## CONCLUSION

Based on the foregoing, the court holds that Commerce's determination of the surrogate value for ocean freight is supported by substantial evidence and otherwise in accordance with law. The court further holds that Plaintiffs' challenge to Commerce's final liquidation instructions is premature. Therefore, Plaintiffs' motion is denied, and the Amended Final Results are sustained. Judgment will be entered accordingly.

/s/ Richard K. Eaton
Judge

Dated: June 12, 2026
New York, New York